### WESTERN SUGAR REFINERY CO. et al. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Ninth Circuit. October 10, 1921.)

Nos. 3446, 3447, 3452-3455, 3458, 3463, 3464, 3486.

1. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Evidence to sustain Federal Trade Commission's order must be sufficient to sustain finding as to each respondent.**

   Order of Federal Trade Commission against food manufacturers, jobbers, and brokers, charged to have conspired and confederated together to deal with a wholesale grocery company on terms and conditions constituting unfair methods of competition in interstate commerce, in violation of Federal Trade Commission Act, § 5 (Comp. St. § 8836e), to be sustained as to a respondent seeking a review of the order, must be supported by evidence sufficient to warrant a finding and conclusion as to such respondent, notwithstanding sufficiency as to other respondents.

2. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Order of Federal Trade Commission must conform to charges.**

   The order of the Federal Trade Commission on charges of unfair methods of competition in interstate commerce, under Federal Trade Commission Act, § 5 (Comp. St. § 8836e), must conform to the charges.

3. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Evidence held sustaining finding of Federal Trade Commission that a concern was engaged in the wholesale grocery business.**

   In proceeding to review orders of Federal Trade Commission requiring food manufacturers, jobbers, and brokers to discontinue alleged unfair methods of competition in dealings with alleged wholesale grocery concern, evidence that such concern had from 250 to 275 retail grocers as customers, of which only 75 or 80 were stockholders, and that it had no interest in any retail grocery business, *held* sufficient to sustain finding of the commission that the concern was engaged in the wholesale grocery business, and was not merely a buyers' exchange for retail dealers.

4. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Federal Trade Commission's finding, supported by legal testimony, conclusive.**

   In proceeding to review orders of Federal Trade Commission, under Federal Trade Commission Act, § 5 (Comp. St. § 8836e), the finding of the commission, if supported by legal testimony, is conclusive.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Trade-marks and trade-names and unfair competition ⊂⊃68—Dealer may refuse to trade with customer, but cannot agree to so do with others.**

A dealer may select his own customers for reasons sufficient to himself, and may refuse to deal with a proposed customer who, he thinks, is acting unfairly and is trying to undermine his trade, but cannot combine and agree with others not to trade with particular customers.

**6. Trade-marks and trade-names and unfair competition ⊂⊃80½, New, vol. 8A Key-No. Series—Evidence held not to sustain findings of Federal Trade Commission as to conspiracy of sugar refiners against wholesale grocer.**

Evidence *held* insufficient to sustain finding of Federal Trade Commission that sugar refiners entered into a conspiracy to refuse to sell to a particular wholesale grocery company on the same terms and at the same price charged competitors of such company, in violation of Federal Trade Commission Act, § 5 (Comp. St. § 8836e), prohibiting unfair methods of competition in interstate commerce.

**7. Trade-marks and trade-names and unfair competition ⊂⊃80½, New, vol. 8A Key-No. Series—Evidence held to sustain finding of Federal Trade Commission as to conspiracy to compel refusal to sell fairly to wholesale grocer.**

Evidence *held* to sustain finding of Federal Trade Commission that jobbers entered into a conspiracy to induce, coerce, and compel manufacturers and distributors to refuse to sell directly to wholesale grocery concern on the terms and prices charged competitors of such concern, in violation of Federal Trade Commission Act, § 5 (Comp. St. § 8836e), prohibiting unfair methods of competition in interstate commerce.

**8. Trade-marks and trade-names and unfair competition ⊂⊃80½, New, vol. 8A Key-No. Series—Evidence held not to sustain finding of Federal Trade Commission as to brokers conspiring to compel refusal to sell fairly to wholesale grocer.**

Evidence *held* not to sustain finding of Federal Trade Commission that brokers conspired with others to induce food manufacturers and distributors, by coercion, persuasion, boycott, or threats, to refuse to sell merchandise directly to wholesale grocery concern at the same prices and on same terms as to its competitors, in violation of Federal Trade Commission Act, § 5 (Comp. St. § 8836e), prohibiting unfair methods of competition in interstate commerce.

Ross, Circuit Judge, dissenting in part.

Petitions to Review Certain Orders of the Federal Trade Commission.

Petitions by the Western Sugar Refinery Company, by Haas, Baruch & Co., by the United Wholesale Grocery Company, by M. A. Newmark & Co., by Mailliard & Schmiedell, by R. L. Craig & Co., by Stetson-Barret Company, by the California Wholesale Grocery Company, by the Channel Commercial Company, and by the California & Hawaiian Sugar Refining Company to review orders of the Federal Trade Commission requiring petitioners to cease and desist from certain alleged unfair methods of competition in interstate commerce, in dealings with the Los Angeles Grocery Company. Affirmed as to Haas, Baruch & Co., the Stetson-Barret Company, R. L. Craig & Co., M. A. Newmark & Co., the United Wholesale Grocery Company, the Channel Commercial Company, and the California Wholesale Grocery Company, and reversed as to the Western Sugar Refinery Company, the California & Hawaiian Sugar Refining Company, and Mailliard & Schmiedell.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Morrison, Dunne & Brobeck and Herbert W. Clark, all of San Francisco, Cal., for Western Sugar Refinery.

Lawler & Degnan and James E. Degnan, all of Los Angeles, Cal., for Haas, Baruch & Co.

Loeb, Walker & Loeb and Irving M. Walker, all of Los Angeles, Cal., for United Wholesale Grocery Co. and M. A. Newmark & Co.

Edward J. McCutchen, A. Crawford Greene and McCutchen, Willard, Mannon & Greene, all of San Francisco, Cal., for Mailliard & Schmiedell.

O'Melveny, Millikin & Tuller and Sayre Macneil, all of Los Angeles, Cal., for R. L. Craig & Co.

Mattison B. Jones, of Los Angeles, Cal., for Stetson-Barret Co.

Harry W. Hanson, of Los Angeles, Cal., for California Wholesale Grocery Co.

Edward M. Selby, of Los Angeles, Cal., for Channel Commercial Co.

Donald Y. Campbell, of San Francisco, Cal., for California & Hawaiian Sugar Refining Co.

Adrien F. Busick and Marvin Farrington, both of Washington, D. C., Joseph A. Burdeau, of New York City, and D. N. Dougherty, of San Francisco, Cal., for Federal Trade Commission.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. The above-named petitioners have petitioned this court to review certain orders of the Federal Trade Commission, requiring them and their co-respondents to cease and desist from certain alleged unfair methods of competition in interstate commerce in dealings with the Los Angeles Grocery Company, in violation of the provisions of section 5 of the Federal Trade Commission Act approved September 26, 1914 (38 Stat. 717 [Comp. St. § 8836e]).

It appears from the record that the Southern California Grocers' Exchange was incorporated under the laws of the state of California in July, 1911. By its certificate of incorporation it was authorized, among other things, "to conduct a general merchandise business, buy and sell foodstuffs, hardware, drugs, chemicals, tobacco, and other merchandise." The stockholders of the corporation were retail grocers exclusively, and the corporation acted as a buying exchange for its stockholders. The name of the corporation was changed by the superior court of Los Angeles county on March 6, 1913, to "Los Angeles Grocery Company." The business of the corporation was continued on a buying exchange basis until January 2, 1918. During this time goods were bought and afterwards sold or distributed to the stockholders of the corporation at approximately the purchase price. At the end of the month the expense of doing business was divided equally among those having purchased or received goods. On December 27, 1917, the board of directors of the corporation adopted a resolution providing that, commencing January 2, 1918, the corporation would discontinue its plan of selling merchandise at cost coupled with an expense assessment, and in the future all merchandise would be sold at a jobbing profit and the business conducted as a jobbing business.

On January 4, 1918, the corporation published in the Commercial Bulletin, a trade paper published in Los Angeles, the following notice:

"L. A. Grocery Company Now Jobbing House.

"Beginning January 2, the Los Angeles Grocery Company ceased to operate as a buying exchange and became an out-and-out jobbing house.

"The company has been pricing all sales to members at cost, plus a percentage to cover expenses of operation. This plan has not been favored by manufacturers generally for obvious reasons. It also has made it confusing for the members to compute their costs accurately. Under the new plan, straight list prices will be charged, though naturally on a basis which will enable the company to compete. An annual accounting will be had, as in any regular business, and earnings, if any, will be distributed in the form of dividends.

"The fact that the company long has enjoyed the option of selling to anybody—not necessarily a member—plus this change, puts it in the same position as the Girard Grocery Company, Philadelphia, which is grocer-owned and which has been very successful. Its sales have grown from some $15,000 to $18,000 monthly two years ago to $160,000 to $175,000 at the present time. ·

The Southern California Grocers' Exchange was incorporated with a capital stock of $50,000. The capital stock of its successor, the Los Angeles Grocery Company, on August 1, 1919, was $250,000, of which $90,000 had been paid up. In the proceedings before the Federal Trade Commission Flavel Shurtleff, the manager of the latter corporation, testified that on July 1, 1919, the corporation carried a stock of goods valued at $280,000, and did business during the year 1919 estimated at $1,750,000; that the corporation sold only to retail grocers, having approximately 250 to 275 customers; that of this number 75 or 80 were stockholders of the corporation; the remaining number were not.

It appears from the record that prior to 1918 the Los Angeles Grocery Company had been purchasing from approximately 125 manufacturers and producers direct on regular wholesale terms and rates; that after January 2, 1918, this number gradually increased during the year 1918, but there still remained at the end of the year many standard articles of grocery merchandise, such as sugar, condensed milk, corn products, shredded wheat biscuits, Quaker Oats, baking powder, and other similar products always in demand, and which the wholesale grocer is expected to have for sale to retail dealers. The manufacturers and producers and their brokers, dealing in some of these standard products, did not sell such articles to the Los Angeles Grocery Company direct, upon wholesale rates and terms, even in carload lots, for the reason, as stated, that they did not consider the Los Angeles Grocery Company a regular wholesale dealer in groceries.

This situation was brought to the attention of the Federal Trade Commission, which proceeded to investigate the charge that certain of the manufacturers and producers, their brokers, wholesalers, and jobbers, were violating the statute in using unfair methods of competition in commerce in dealing with the Los Angeles Grocery Company. On Friday, February 20, 1919, the Federal Trade Commission issued its complaint against the petitioners and their co-respondents charging them with a violation of the Federal Trade Commission Act (Comp. St. §§ 8836a–8836k). To this complaint all the respondents cited before the

commission made answer, with such denials and averments as placed in issue the material allegations of the complaint. Testimony was thereupon taken upon said issues, and the commission made its findings of fact and its conclusions and order thereon.

Its findings are in substance that the Los Angeles Grocery Company since January 2, 1918, had been and then was engaged in the business of purchasing in wholesale quantities goods and commodities, such as are generally carried by those engaged in business as a wholesale grocer, and selling the same in wholesale quantities for profit to its customers; that said company sells the goods and commodities dealt in by it to the retail grocery trade only, and does not sell to consumers; that there are about 80 stockholders of said company, most of whom are retail grocers; that said company sells to a large number of retail grocers who are not stockholders; that the business of said Los Angeles Grocery Company is separate and distinct from the business of any of its stockholders, and said company has never owned, controlled, or had an interest in any retail grocery or groceries, and has never conducted a retail business; that the said Los Angeles Grocery Company and the respondent jobbers, namely, Haas, Baruch & Co., Stetson-Barret Company, R. L. Craig & Co., M. A. Newmark & Co., United Wholesale Grocery Company, Channel Commercial Company, and California Wholesale Grocery Company, are competitors in the business of buying and selling in wholesale quantities, in the usual course of wholesale trade, groceries, and food products, such as are bought and sold generally by persons, firms, and corporations engaged in the business generally known as that of a wholesale grocer; that the Los Angeles Grocery Company, in the course of its said business, purchases the goods and commodities dealt in by it in the various states and territories of the United States, and said goods and commodities are transported to the said Los Angeles Grocery Company in the state of California, where such goods and commodities are resold in the course of wholesale trade, and there is continuously, and has been at all times mentioned in the complaint, a constant current of trade and commerce in the goods and commodities so purchased by the Los Angeles Grocery Company between the states and territories of the United States; that since January 2, 1918, all of the respondents, with the purpose and intent of stifling, suppressing, and preventing competition in commerce between the Los Angeles Grocery Company and the respondent jobbers, and with the purpose and intent of preventing the said Los Angeles Grocery Company from obtaining the goods and commodities dealt in by it from manufacturers and manufacturers' agents and other usual sources from which a wholesale dealer in groceries must obtain such commodities, have secretly agreed and conspired among themselves, and have had secret understandings with each other that the said Los Angeles Grocery Company was and is not conducting its business in accordance with certain tests or standards fixed and established by said respondent jobbers, and have agreed and conspired among themselves to state and represent to various manufacturers and their agents that the Los Angeles Grocery Company was not conducting its business in accordance with such tests and standards, and have fur-

ther agreed and conspired among themselves to induce, coerce, and compel, by means of boycott and threats of boycott, manufacturers of grocery and food products and their agents to refuse to deal with or sell to the Los Angeles Grocery Company, in interstate commerce, upon the terms, and at the prices offered and charged to its competitors, including the respondent jobbers and others engaged in similar business, and to compel said company to purchase its supplies from and through the respondent jobbers, all of whom are competitors of said company; that the respondent brokers, namely, the C. E. Cumberson Company, the Colbert Company, Flint & Boynton, Franz, Cunningham & Co., Hamilton & Menderson, Henderson & Osborn, Holmes-Danforth-Creighton Company, Johnson, Carvel & Murphy, Kelley-Clarke Company, Laukota-Garriott Company, D. A. MacNeil & Son Company, Mailliard & Schmiedell, Cosmo Morgan Company, Parrott & Co., Bradley-Kuhl Company, Spohn-Cook Company, J. H. Stewart Company, the J. K. Armsby Company, and Schiff Lang Company, induced by coercion, persuasion, boycott, and threats of boycott on the part of the respondent jobbers, have agreed and conspired among themselves, and with the other respondents mentioned, to refuse to sell to the Los Angeles Grocery Company the products manufactured by their respective principals upon the terms and at the prices offered and charged to the competitors of said company, including the respondent jobbers, and others engaged in similar business, and to recommend to their respective principals that they should not sell to said Los Angeles Grocery Company upon such terms and at such prices, and have further agreed and conspired to compel the Los Angeles Grocery Company to purchase said products from and through the respondent jobbers, who are competitors of said company, at prices higher than those charged to such competitors and others engaged in similar business; that the respondent refiners, namely, Western Sugar Refinery and California & Hawaiian Sugar Refining Company, have agreed and conspired between themselves and with each other, and with the other respondents mentioned in the complaint, with the purpose of stifling, suppressing, and preventing competition between the Los Angeles Grocery Company and the respondent jobbers, to refuse to sell sugar to the Los Angeles Grocery Company upon the terms and at the prices offered and charged to its competitors, and to compel the Los Angeles Grocery Company to pay for sugar purchased by it prices higher than those charged to its competitors and others engaged in similar business.

The commission also found other facts in detail supporting and elaborating the facts stated, and as conclusions that, under the conditions and circumstances set out in the findings of fact, the agreements, understandings, policies, and practices of the respondents, as described in the findings of fact, constituted a conspiracy or combination as alleged in the complaint; that under the conditions and circumstances set forth in the findings of fact, the acts, agreements, understandings, and practices of the respondents constituted an interference with the right of the Los Angeles Grocery Company and other persons, firms, and corporations, to buy and sell commodities in interstate commerce,

wherever, from and to whomsoever, and at whatsoever price such persons, firms, or corporations may agree upon among themselves, and that under the conditions and circumstances set forth in the findings of fact the acts, agreements, understandings, policies, and practices of the respondents, the respondent jobbers, the respondent brokers, and respondent refiners, and each and all of them, constituted unfair methods of competition in interstate commerce, in violation of the provisions of section 5 of an act of Congress approved September 26, 1914, entitled "An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes."

Thereupon the commission entered an order against the 28 parties named in the complaint, requiring them to cease and desist from directly or indirectly combining and conspiring among themselves to induce, coerce, or compel manufacturers or manufacturers' agents to refuse to sell to the Los Angeles Grocery Company, or to refuse to sell to said company upon the terms and at the prices offered and charged to competitors of said company and others engaged in similar business. The order of the commission is also elaborated in detail with respect to the acts of each of the respondents. The matters in detail in the findings and in the conclusions and order of the commission need not be set out in determining the questions involved in this review of the order of the Commission.

The jurisdiction of this court is provided for in section 5 of the Act of September 26, 1914 (38 Stat. 717), as follows:

"Any party required by such order of the commission to cease and desist from using such method of competition may obtain a review of such order in said Circuit Court of Appeals by filing in the court a written petition praying that the order of the commission be set aside. A copy of such petition shall be forthwith served upon the commission, and thereupon the commission forthwith shall certify and file in the court a transcript of the record as hereinbefore provided. Upon the filing of the transcript the court shall have the same jurisdiction to affirm, set aside, or modify the order of the commission as in the case of an application by the commission for the enforcement of its order, and the findings of the commission as to the facts, if supported by testimony, shall in like manner be conclusive."

In a previous part of this section it was provided that:

"If such person, partnership, or corporation fails or neglects to obey such order of the commission while the same is in effect, the commission may apply to the Circuit Court of Appeals of the United States, within any circuit where the method of competition in question was used or where such person, partnership, or corporation resides or carries on business, for the enforcement of its order, and shall certify and file with its application a transcript of the entire record in the proceeding, including all the testimony taken and the report and order of the commission. Upon such filing of the application and transcript the court shall cause notice thereof to be served upon such person, partnership, or corporation and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree affirming, modifying, or setting aside the order of the commission. The findings of the commission as to the facts, if supported by testimony, shall be conclusive."

Ten of the 28 respondents before the commission have petitioned the court for a review. The remaining 18 are described as brokers. These

accepted the order of the commission, either because they believed they had not violated the statute and had no intention of doing so, and the order imposed no restraint upon them that they cared to resist, or, having violated the statute, they would accept the order as directed.

In St. Louis, I. M. & S. Ry. Co. v. United States (D. C.) 217 Fed. 80, a score of railroads attacked an order of the Interstate Commerce Commission finding that there was undue preference in railroad rates in favor of Cairo, Ill., and undue discrimination in such rates against Metropolis. Two of the roads applied for an injunction against the order of the commission. The other roads acquiesced in the order. The application was heard by three judges under the provisions of the Act of October 22, 1913 (38 Stat. 220). In the course of his opinion, Circuit Judge Baker, speaking for the court, said:

"All of the respondent railroads, except these two complainants, have apparently acquiesced in the order; and we are of the opinion that the evidence before the commission was sufficient on which legally to base a finding that discrimination against Metropolis was exercised by some of the railroads which were respondents in the proceeding before the commission. It is now argued by the defendants in this case that, because there was evidence before the commission to justify a finding of discrimination by some, the order must stand as against all the railroads which were parties to the hearing. In our opinion this is erroneous. In a civil case against a number of defendants, or in a criminal indictment against numerous defendants, a judgment cannot be permitted to stand against a certain defendant, if there is no evidence against him, merely because there may be evidence which would support the judgment against other defendants. And so we believe that, as a matter of law, an order of the Interstate Commerce Commission must be supported by evidence which is sufficient to warrant a finding separately against each railroad named in the order."

[1, 2] We are of the opinion that this law is applicable to the statute in this case, and particularly in view of the charge against the respondents that they conspired and confederated together and with each other to deal with the Los Angeles Grocery Company upon terms and conditions which the commission has found and concluded constituted unfair methods of competition in interstate commerce. Manifestly the order of the commission, based upon such a charge of conspiracy and upon the findings and conclusions sustaining the charge, must be supported by evidence which is sufficient to warrant a finding and conclusion separately against each respondent seeking a review of this order of the commission.

In Federal Trade Commission v. Gratz, 253 U. S. 421, 427, 40 Sup. Ct. 572, 574 (64 L. Ed. 993), the Supreme Court, referring to the proceedings and order under section 5 of the Federal Trade Commission Act, said:

"Such an order should follow the complaint; otherwise it is improvident, and, when challenged, will be annulled by the court."

It follows that the order of the commission must follow the charge in the complaint and that the charge in the complaint must be supported by evidence.

We have, then, before us the petitions of the two sugar refiners in San Francisco, the petitions of seven wholesalers or jobbers in Los

Angeles, and the petition of one broker engaged in business in Los Angeles. These petitions raise substantially the same issues as were raised by their answers to the complaint before the commission, but our inquiry is limited by the statute to the question whether there is testimony in the record supporting the findings and conclusions of the commission, and to questions of law.

(1) Is there evidence in the record supporting the finding that the Los Angeles Grocery Company was engaged in wholesale grocery business in Los Angeles after January 2, 1918?

(2) Is there evidence in the record supporting the finding of the commission that the respondents, or any of them, agreed and conspired among themselves and with each other for the purpose of using any unfair method of competition in commerce in dealing with the Los Angeles Grocery Company?

[3, 4] With respect to the business of the Los Angeles Grocery Company since January 2, 1918, there is evidence tending to establish the character of its business as that of a wholesale dealer or jobber. We have already referred to the testimony of Flavel Shurtleff, the manager of the company, on that subject. There is other testimony in the record to the same effect; but it is not necessary to pursue this question further, for, while respondents do not admit that the Los Angeles Grocery Company has become a wholesale dealer or jobber, they do not directly or specifically deny it either by their petition or other specification of error. They contend that the company continued after January 2, 1918, to have such characteristics of a buyers' exchange for retail dealers that respondents were justified, acting separately and individually, in believing that the company was not a wholesale dealer in the sense in which that term is generally understood. If the finding of the commission upon this issue is supported by legal testimony, it is by the statute made conclusive, and we can go no further in this review.

The important question is the conduct of the respondents in dealing with the Los Angeles Grocery Company, and the first element to be considered in that question is the charge of a conspiracy on the part of the respondents in using unfair methods of competition in commerce in such dealings.

[5] It is the settled law that the individual dealer may select his own customers for reasons sufficient to himself, and he may refuse to deal with a proposed customer who he thinks is acting unfairly and is trying to undermine his trade. Eastern States Lumber Ass'n v. United States, 234 U. S. 614, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788. But, as was said by the Supreme Court in Grenada Lumber Co. v. Mississippi, 217 U. S. 433, 440, 30 Sup. Ct. 535, 538 (54 L. Ed. 826):

"When the plaintiffs in error combine and agree that no one of them will trade with any producer or wholesaler who shall sell to a consumer within the trade range of any of them, quite another case is presented. An act harmless when done by one may became a public wrong when done by many acting in concert, for it then takes on the form of a conspiracy, and may be prohibited or punished, if the result be hurtful to the public or to the individual against whom the concerted action is directed."

The evidence before the court was the evidence before the commission. Flavel Shurtleff, the manager of the Los Angeles Grocery Company, whose testimony has heretofore been referred to, testified that he had a telephone conversation with S. F. Brown about January 1, 1918. Brown was a member and manager of the brokerage firm of Parrott & Co., located in Los Angeles, engaged in selling sugar and other grocery commodities. This conversation Mr. Shurtleff reduced to writing at the time in the form of a memorandum, and when called as a witness he produced this memorandum and recalled the conversation he had with Mr. Brown as follows:

"I called Mr. Brown on the phone and told him that I wanted to give him an order for a carload of 600 bags of sugar; and he says, 'How is that? To be shipped direct to you fellows?' 'Yes, sir.' 'It could not be done; out of the question; inconsistent; entirely out of line with our methods of doing business; would get us in trouble with the other jobbers.' I told him that it was necessary for us to have sugar direct, or we would be put out of business. He said that our people could get sugar through the regular channels, and he thought that was the proper way for them to get it. .He said that it was against their policy of doing business; that they had well-defined lines of going through the old-line jobbers, and that that policy he would have to follow. I told him that I had called Mr. Strodoff, and Mr. Strodoff had referred me to him as the sales department, and I was now making application to him. He says: 'Shurtleff, it cannot be done. Personally I would just as soon sell a car of sugar to you as I would to Haas Baruch, or any of the other jobbers, but it would get us in trouble, disturb our business relations here, and it can't be done.' "

The witness testified that later on, after this telephone conversation, he called by appointment at the office of Parrott & Co. and spent an hour and a half with Mr. Brown going over the different lines that they had, and asking him to sell the Los Angeles Grocery Company the different lines direct. Shurtleff testified that it would be impossible for him to give the entire conversation, but he recalled it as follows:

"I recalled to him that at one time I represented Parrott & Co. on some of the lines that he was representing them on, and that I had sold those lines to the trade here, and had gotten them a volume of business that was satisfactory, and that Parrott & Co. headquarters in San Francisco agreed to that policy, and I could not understand why they gave me that privilege as a broker and that they did not give him that privilege. He said to me in answer, 'Shurtleff, the same proposition holds good on this line that it does on the sugar. We cannot sell you these goods direct without interfering with our business relations with the other jobbers, and until you can get on the direct list on sugar it is absolutely impossible for us to do business with you on the other lines.' "

Mr. Shurtleff testified further that he made application to the C. & H. Sugar Refining Company (California & Hawaiian Sugar Refining Company); that he had a conversation with Mr. W. R. K. Young, the assistant general manager of that company, as follows:

"I said to Mr. Young, 'I am simply asking of you personally what I have sent a number of—at least two representatives to ask you for before; that is, to put the Los Angeles Grocery Company on direct for C. & H. sugar. And in order that you may realize that we can buy a quantity of sugar that would justify your giving us an affirmative answer, I will now place with you an order, if you will put us on the direct list, for 25,000 bags to be shipped to the Los Angeles Grocery Company at specified periods and during the next few

months. I will also give you an order for 20,000 bags to be shipped to certain canneries whose business I can give you. We will accept the sugar sight draft attached to bill of lading and take care of the payments.' Mr. Young says, 'That is a nice piece of business you are offering us, Shurtleff, and we want the business; we need the business. I am sorry Mr. Brown is not here, so that you can talk to him personally. I will report the matter to Mr. Brown, and I see no reason why we can't do business with you.'"

Mr. Shurtleff testified that he saw Mr. Young within 90 days in Los Angeles at the office of the Los Angeles Grocery Company, where he had a conversation with him; that he took Mr. Young around the place and Mr. Young said to him:

"Mr. Shurtleff, Mr. Brown has sent me down to look you over. I will be glad to have you show me over your house and tell me how you are conducting your business."

Shurtleff testified further:

"I took Mr. Young over the house, showed him our place of business, how we were conducting business, and he says: 'It looks to me like you had a wholesale house here. I don't see why we can't sell you sugar. I will so report to Mr. Brown.' The Los Angeles Grocery Company was never put on the direct list. We buy sugar from that company through Louis Seroni. We get the regular terms on it plus 5 per cent. brokerage. We bought $20,000 worth last week."

Mr. S. F. Brown was called as a witness on behalf of the respondents. His attention was called to the testimony of Mr. Shurtleff, wherein he testified that Brown had said it would get them into trouble with the jobbers, referring to the matter of selling to the Los Angeles Grocery Company; that it was his policy to do business with the old-line jobbers, and that it would get them into trouble to disturb their business relations, and could not be done. He was asked if he ever made such a statement. His reply was: "I would say no." On cross-examination Brown was asked about a telephone conversation with Shurtleff concerning placing an order for 600 bags of sugar in a car, to which Brown replied:

"'A car? Well, how do you mean about that, to be shipped to you folks? Well, we couldn't do that anyhow. It would be absolutely, inconsistent and unfair, and would lead us into trouble.' Mr. Shurtleff asked him. 'How?' to which Brown replied, 'Because it would lead us into trouble in the general business here'"

—and Mr. Brown testified that that was the substance of the conversation.

W. R. K. Young was also called as a witness for respondents. He contradicted Mr. Shurtleff's testimony in the main, but admitted that the California & Hawaiian Sugar Refining Company declined to sell directly to the Los Angeles Grocery Company. On cross-examination he testified that the California & Hawaiian Sugar Refining Company had always distributed its products through the wholesale grocers of the United States and the manufacturers.

Mr. Shurtleff testified with respect to an application to the Western Sugar Refinery Company for sugar to be sold to the Los Angeles Grocery Company direct. He said he had negotiated with Cosmo Morgan during the first four months of 1918 in his office about being put on the

**direct** list on Western Sugar Refinery Company sugar. The witness testified:

"I told Mr. Morgan that I had come with the idea of asking him to put us on the direct list on sugar, and that the reason for coming was that we had changed our plan of doing business and were now conducting our business as a wholesale grocery, and that our representative in San Francisco had called on the San Francisco representative, Mr. Jennings, and we had been referred to him, and that I felt we were entitled to be put on the list, and asked him what he could do for us. He answered, 'Who are your stockholders?' I told him practically the same stockholders that we had had previously, with myself and Mr. Dole and one or two others, but aside from that they were the same. He asked me how we were conducting the business. I told him. He said, 'Mr. Shurtleff, it would be absolutely out of the question from my point of view, as it would be revolutionary. It would disturb conditions in Los Angeles, and you are not entitled to it. It cannot be done.'"

A letter was introduced in evidence, dated at Los Angeles, January 7, 1918, addressed to the Western Sugar Refining Company, San Francisco, Cal., and signed by Cosmo Morgan Company. The letter reads as follows:

"The Los Angeles Grocery Company, of this city, which was formerly a buying exchange for 88 retail groceries of Southern California, have now applied to us to sell them direct. They claim that they have ceased being a buyers' exchange, and now sell their members on a profit basis, just as any wholesale grocery company does. They also intend to sell to other retailers in Southern California, and do a general jobbing business. They base their claim on the fact of manufacturers selling direct to Girard of Philadelphia, who they claim buys from all manufacturers.

"We beg to inform you that we have interviewed all of the wholesale grocers of Southern California, and they very much object to us selling them. We also called on the Los Angeles Grocery Company to ask for particulars of how they made their claim of being wholesale grocers, and they stated that their former members, consisting of 88 retail grocers, furnished the capital for their wholesale grocery house. In other words, it is nothing else but a buying exchange, just as it always has been, except for the difference as stated above. If we do sell the Los Angeles Grocery Company, it will have the effect of revolutionizing the entire grocery business of Southern California, from the fact that there are other chain stores operating here. H. G. Chaffee Company, of Pasadena, have 26 stores. Ralph Grocery Company and Albert Cohn have chain stores doing a larger business than the Los Angeles Grocery Company have done with their 88 stores. These concerns would be fully justified in applying for the same buying privileges as the Los Angeles Grocery Company.

"This contention to buy direct is something new with us, and we feel that it is entirely up to our principals to decide the matter. We therefore ask you to kindly instruct us whether or not we shall sell them direct."

Mr. Morgan was called as a witness for the respondents. In the course of his testimony he said that he had been in the place of business of the Los Angeles Grocery Company; that he found it had an excellent establishment, most excellently conducted, fair in size, with a fair stock on hand. He did not know what they buy, because he did not sell to them; but, looking at their stock, he would say that in some cases they did buy in wholesale quantities. They tendered an order to one of his principals for what he would regard as a wholesale order, but the order was declined. He understood that all of their members were retail grocers, but could not say that the company limited its sales

to its stockholders. He understood that the corporation sold to anybody who came in to buy, providing he was a retailer, but he never heard of the company owning or controlling a retail grocery.

A. A. Brown, the sales manager of the California & Hawaiian Sugar Refining Company, was called as a witness by the commission upon a subpœna to produce certain records. He produced a telegram dated July 2, 1918, addressed to the California & Hawaiian Sugar Refining Company at San Francisco, as follows:

"Morning Times, Washington dispatch, states Food Administration rules Los Angeles Grocery Company regarded a jobber under new sugar regulation. Local jobbers meet this morning to enter protest. D. A. MacNeil & Son Co."

To this telegram was attached a newspaper clipping, which was also introduced in evidence without objection. The clipping reads as follows:

"Los Angeles Grocery Company a Jobber. Is Given That Classification in Connection with All Sugar Regulation. (Exclusive Dispatch.) Washington, July 1.—Herbert Hoover, Food Administrator, to-day ruled that the Los Angeles Grocery Company, the buying department for 250 retail stores in Los Angeles and vicinity, should be regarded as a jobber in the new sugar regulations. Accompanied by Congressmen Osborne and Kettner, F. M. Clark and J. B. McPheran, representing the grocery company, called on Mr. Hoover by appointment and were able to convince him that they are entitled to the jobbers' classification in connection with all sugar regulation of the present and future. Later in the day further conferences were held to work out the details of the proposition."

A telegram dated at San Francisco, July 2, 1918, signed by the California & Hawaiian Sugar Refining Co., and addressed to Andrew A. Brown, Washington, D. C., was also introduced in evidence, as follows:

"Newspaper telegraphic dispatch from Washington this morning states Food Administration rules Los Angeles Grocery Company be classified as a jobber under new sugar regulation. Can you verify?"

Mr. Brown testified that he received this telegram at Washington; that he was the direct representative of the California & Hawaiian Sugar Refining Company upon the American Finance Committee, and was representing general cane and beet arrangements. He testified that he went to the legal deparment of the Food Administration and found that the ruling did not apply to cane sugar at all.

Rollin W. Dole, a buyer for the Los Angeles Grocery Company, called as a witness for the commission, testified to a conversation with Mr. Brown, of the California & Hawaiian Sugar Refining Company, wherein Dole made application to have the Los Angeles Grocery Company put on the direct list for sugar; that Mr. Brown, in denying the application, said:

"Well, if we put you people on the direct list, we will have to put on a whole lot of people up and down this coast. There are several organizations here in San Francisco, and a lot of big retailers who would claim to be in the same position you are in, * * * and if we open up all these extra accounts, this building would not hold the office force that I would have to have."

275 F.—47

Dole testified that during this conversation he said to Brown:

"Our Los Angeles Grocery Company is exactly like the Franklin and Girard Grocery Companies in Philadelphia. They are buying of the Franklin Sugar Refining Company in Philadelphia, and I know that because I have investigated it personally, and I cannot see upon what ground you can base a refusal to sell our compay, if our plan of operation is the same."

To which Brown answered:

"Yes, in the East that is probably true. There are lots of people upon the sugar refining companies' direct list, but back East the sugar refiners have a lot of business men with whom they are dealing. They are not interested in whether Tom Brown, at the corner, buys a case of some kind of cereals, or a bag of salt, or a bag of sugar direct or not, or to whom he sells it. They are too busy attending to their own business; but out on this coast we have a lot of jobbers who are damned babies."

Dole further testified to a conversation with Cosmo Morgan; that Morgan came down to look over the Los Angeles Grocery Company, with a view to considering their application to get upon the direct list on sugar and other commodities represented by Morgan; that Morgan stated that he could not see any difference between the Los Angeles Grocery Company and Ralph's Grocery Company, or Albert Cohn, or Sam Seelig Company, or any of the big chain stores; that they were retailers, and that he did not believe they were entitled to buy sugar direct; that Morgan said:

"Well, if you can bring about the result that you desire, namely, getting on the direct list, it certainly will revolutionize conditions up and down this coast in a business way."

On February 20, 1919, Schiff-Lang Company, of Los Angeles, one of the original respondents in this case before the Federal Trade Commission, addressed a letter to F. E. Booth Company, San Francisco, as follows:

"We beg to acknowledge receipt of your favor of February 19th, in reference to the Los Angeles Grocery Company, and, in reply, wish to say that these people are not legitimate jobbers, but are virtually a buying exchange for about 88 retailers. For your information, wish to say that we do not sell these people for any of our principals, and that none of the leading manufacturers of the country recognize them as jobbers. It is possible for the Los Angeles Grocery Company to buy, as they have been in the past, through any of the jobbers in this city.

"The status of this company was clearly established by the Sugar Administration Board, who refused to recognize them as jobbers, according to the best information we have been able to obtain. And, further, the Southern California Association of Manufacturers' Representatives, as a body, are on record as against soliciting business from this firm. For your further information, would advise that, if sales were made direct to this concern, it would undoubtedly very seriously affect your present pleasant relations with all our Los Angeles jobbers."

On March 3, 1919, Schiff-Lang Company wrote F. E. Booth Company, correcting their former letter, as follows:

"We have for acknowledgment your favor of the 1st and are returning herewith communication, as requested. In looking over ours of the 20th, in order to answer your letter, we note that we made a statement that 'the Southern California Association of Manufacturers' Representatives, as a body, are on record as against soliciting business from this firm.' We wish to ad-

vise that this statement is not a fact, and was made, on our part, entirely without authorization or full knowledge. To the best of our knowledge, this Association is not on record in any way as affects the Los Angeles Grocery Company. We further, though, repeat our statement that, to the best of our knowledge and belief, there is not a jobber in this city but that will sell the Los Angeles Grocery Company.

"As it is evident that our original letter to you was forwarded to this company, we would ask that you forward this letter to them, in order to correct the wrong statement as contained in ours of the 20th."

John J. Wartman, vice president of Johnson, Carvell & Murphy, one of the original respondents before the Federal Trade Commission, was called as a witness for the respondents. He testified that his house sold to the jobber and manufacturing trade, but that it did not sell the Los Angeles Grocery Company; that whenever the question came up between him and his principals, he recommended practically in all instances that no sale be made direct to the Los Angeles Grocery Company.

C. M. Gair, secretary and treasurer of Johnson, Carvell & Murphy, was called as a witness by the commission upon a subpœna to produce certain records. He produced a letter to the Royal Baking Powder Company, New York, dated January 17, 1918, and signed by Johnson, Carvell & Murphy, which reads in part as follows:

"We inclose herewith copy of a letter which was received from the Los Angeles Grocery Company, and desire to say that this letter was sent to us with the request that we put before our different principals the question of selling this concern their products direct. * * * While we do not desire to offer any particular recommendation, it does not seem as though an additional wholesale distributor of groceries was a necessity in this market at this time, and it would occur also to us, from the manner in which the Los Angeles Grocery Company has been, and is now, acting as a buyers' exchange for this chain of retailers, that putting them on the direct buying list might be looked upon as rather an unfriendly act by both the regularly qualified jobbers now covering this territory, and also by many of the large retailers, who have no connection with the Los Angeles Grocery Company, and who might feel they were equally entitled to the same consideration."

It appears from the evidence that Fred Fear & Co., of New York, produced an article known as "My Wife's Salad Dressing." Their agent in Los Angeles about August 1, 1918, was Mr. Crawford. He called upon Mr. Arthur Lee, a buyer for the Los Angeles Grocery Company, and informed the latter that Fred Fear & Co. had placed the Los Angeles Grocery Company on the direct list. The Los Angeles Grocery Company had a letter from Fred Fear & Co. at that time to the same effect. Crawford and Lee proceeded in the matter of price and quantity of the commodity to be purchased. The matter was continued until the next day, when Crawford informed Lee that the order from Fear & Co. had placed him in a peculiar predicament; that it was absolutely necessary for him to protect or take off the hands of the jobbers who had "My Wife's Salad Dressing" all of that commodity they had on hand. Those who had the goods gave as reason that, inasmuch as the Los Angeles Grocery Company was to receive that article direct, it would be impossible for them to handle the goods, and they would expect Crawford, as a broker, to relieve them of such goods. The negotiations resulted in the taking over by the Los Angeles Grocery Com-

pany of all the cases of this article in the hands of the jobbers in Los Angeles—from Haas, Baruch & Co. 5 cases of small, 2 cases of medium, and 2 cases of large; from Stetson-Barret Company 10 cases of small, 10 of medium, and 5 of large; from the United Wholesale Grocery Company 10 cases of small, 10 of medium, and 5 of large—making a total of 25 small, 23 medium, and 12 large, or a total of 60 cases.

It further appears from the testimony of Arthur Lee that the Channel Commercial Company objected to "My Wife's Salad Dressing" being sold direct to the Los Angeles Grocery Company. Mr. Lee testified:

"On Friday, August 2d, when Mr. Crawford came in, he says, 'Mr. Lee, I thought that this matter that we had yesterday regarding My Wife's Salad deal was in confidence.' I said, 'I assure you, Mr. Crawford, it was, so far as I am concerned.' I says, 'What is the trouble now? Has somebody caught you at it?' He said, 'Yes; as I told you, I was going to explain to all the jobbers what my principals had instructed me to do, in order to clear my skirts for future transactions, but I had intended only to confess to those whom I knew had merchandise.' I said, 'If anybody else knows of that, I can't imagine who it is, Mr. Crawford, unless it be the Channel Commercial Company. * * *' 'Well,' he says, 'when I went into the office of the Channel, either that afternoon or that morning, Mr. R. J. Porter immediately jumped on me,' as Mr. Crawford expressed it, 'and said, "I understand you have changed your policy from that of selling to wholesale grocers to that of selling to retailers."'"

Flavel Shurtleff testified that the Los Angeles Grocery Company bought direct certain cereal products sold by Colbert & Co. William Russell Walters, connected with Colbert & Co. from April, 1917, to June, 1917, as salesman, and until November, 1918, as manager, called as a witness by the commission, testified that he was the agent of Colbert & Co. at Los Angeles, and that while he was such agent and representative of Colbert & Co. he told Shurtleff that he was afraid he was going to lose his job if he did not discontinue selling to the Grocery Company direct. Walters further testified to a conversation with Hunt, of Stetson-Barret Company, wherein Hunt said that he (Walters) would get in bad if he sold direct to the Los Angeles Grocery Company.

Arthur C. Chase, manufacturers' agent, selling breakfast food, health food, and canned goods, a witness for the commission, testified that Hunt said to him:

"If you sell the Los Angeles Grocery Company, you will be dropped by the jobbers like a hot potato."

Walters also testified to a conversation with a representative of the Stetson-Barret Company, Mr. Gough; that Gough asked him if he sold the Los Angeles Grocery Company direct, and he denied doing so. The denial he said was untrue. He gave as a reason for the denial that he did not want the jobbers to know that he was selling the Los Angeles Grocery Company direct. He (Walters) said his company could not afford to incur the jobbers' displeasure.

Verne M. Osborne, a merchandise broker residing in Los Angeles, a witness for the respondents, testified to a conversation with Mr. Tuttle, of R. L. Craig & Co.; that Tuttle asked him if he sold the Los Angeles Grocery Company, and that he replied he would sell, if he had anything to sell them.

Harry A. Pierce, representing Bixby & Co., of Los Angeles, a witness for the commission, testified that he sold the Los Angeles Grocery Company direct, and that he had received a letter from R. L. Craig & Co., asking if he had sold the Grocery Company direct; that later he had a conversation with Mr. Hartford, of R. L. Craig & Co., wherein Mr. Hartford explained to him that the Los Angeles Grocery Company were retailers, and not wholesalers, and that he did not think retailers ought to buy on the wholesale list.

Arthur C. Chase also testified to a conversation with Mr. Robert Newmark, of M. A. Newmark & Company, one of the original respondents, and that Mr. Newmark inquired of him if he were selling the Los Angeles Grocery Company direct. That was the end of the conversation.

C. H. Snead, a merchandise broker residing at Alhambra, representing Kelley Clarke Company, testified that Mr. Robert Newmark inquired of him if he were selling the Los Angeles Grocery Company direct.

Henry A. Sloss, salesman for Woodman Packing Company and their agent, a witness for the commission, testified that he sold the Los Angeles Grocery Company direct, and that Mr. Sprouse, of the California Wholesale Grocery Company, said to him he had heard—the rumor had been spread—that he (Mr. Sloss) was selling the Los Angeles Grocery Company direct.

The Western Sugar Refinery Company and the California & Hawaiian Sugar Refining Company sold their sugar to the Los Angeles jobbers, and they, in turn, sold or would sell to the Los Angeles Grocery Company as to a retail dealer, but the refiners would not sell direct to the Los Angeles Grocery Company at the usual rates and terms to jobbers, for the reason, as stated by them, that they did not regard the Los Angeles Grocery Company as a wholesale dealer or jobber. There is no testimony in the record that this course of action on the part of the two sugar refiners arose from any actual understanding or agreement between them or with the Los Angeles jobbers. The testimony proves that it was a concurrence of opinion as to the classification to be given to the Los Angeles Grocery Company, but we do not find anything more in the testimony. This classification appears from the testimony to have been erroneous, but as long as it was the individual opinion and action of the refiners, it could not be made the basis of a finding of conspiracy or combination between the two refiners, or between them and the jobbers, or between them and the brokers.

[6] The difficulty has long been recognized of drawing a definite line between the innocent act of an individual and the same act made unlawful by reason of its being the joint or combined act of two or more; but whenever this question arises there must be some legal evidence to establish the unlawful combination or conspiracy, or facts from which that inference may be legally drawn, or the charge must fail. We do not find such evidence in this record with respect to the two sugar refiners.

[7] With respect to the Los Angeles jobbers, we think the testimony is more definite and clear, and does tend to support the finding of a

combination or conspiracy between them to prevent manufacturers and producers from selling directly to the Los Angeles Grocery Company as to a wholesale dealer or jobber. This conclusion relates to the respondents Haas, Baruch & Co., Stetson-Barret Company, R. L. Craig & Co., M. A. Newmark & Co., United Wholesale Grocery Company, Channel Commercial Company, and California Wholesale Grocery Company.

[8] With respect to the acts of Mailliard & Schmiedell, the only brokers seeking a review of the order of the Commission, we do not find that the testimony supports the finding that they combined or conspired with other brokers, or with the refiners, or with the jobbers, or that they were induced by coercion, persuasion, boycott, or threats, to prevent the Los Angeles Grocery Company from purchasing direct from the manufacturers and producers at jobbers' rates and terms.

The order of the court will be to affirm the order of the Federal Trade Commission with respect to the finding and conclusion that the Los Angeles Grocery Company has been a wholesale dealer or jobber since January 2, 1918. The order will also provide for the affirmance of the order of the Federal Trade Commission with respect to the seven jobbers, namely, Haas, Baruch & Co., Stetson-Barret Company, R. L. Craig & Co., M. A. Newmark & Co., United Wholesale Grocery Company, Channel Commercial Company, and California Wholesale Grocery Company, and to reverse it as to the Western Sugar Refinery Company, the California & Hawaiian Sugar Refining Company, and Mailliard & Schmiedell.

ROSS, Circuit Judge (dissenting in part). I dissent from that portion of the order of this court affirming that of the Federal Trade Commission in any respect, for the reason that, in my opinion, the record shows that the true status of the Los Angeles Grocery Company was that of a buying exchange, and cannot be properly regarded as a wholesale dealer, and, that being so, that the petitioning wholesale dealers, whose legitimate business mainly, if not entirely, depends upon the custom of retailers, were justified in combining to protect such legitimate business. The witness Shurtleff, who had charge of the business of the Los Angeles Grocery Company, having admitted in his testimony that it was that of a buying exchange until January 1, 1918, said:

"We bought the goods at a given price, turned around, and sold those goods to our stockholders at approximately the same price that we bought them at, and at the end of the month the expense of doing business was divided equally among those having purchased. That was continued until January 1, 1918. Just prior to January 1, 1918, action was taken by the directors and confirmed by the stockholders that on and after that date we would discontinue buying goods and selling them without a profit, and assessing the expense of doing business at the end of the month, but that the business would be conducted for profit. We would buy those goods in the regular jobbing way, as many of them as we could, direct, and what we could not buy direct, wherever we could get the best price, and in turn would sell these goods for profit, as any wholesale grocer would, taking into consideration the expense of doing business, and all the time figuring on having a 1 per cent. net above the cost of doing business, in which to justify the investment of our stockholders."

This testimony itself shows, it seems to me, that the change so made, arranging for a nominal 1 per cent, net above the cost of doing business, was a mere incident in the main business for which the corporation was organized and carried on, namely, the buying for its large number of retail stockholders, and was so arranged in the endeavor to make it appear that the company was a wholesale dealer. Moreover, in the cross-examination of the witness Morgan, that witness, in answer to a question by counsel for the Trade Commission as to what he meant by "members" of the Grocery Company, having answered:

"I mean that the members of the Los Angeles Grocery Company and the stockholders are nothing else but retailers"

—the counsel for the commission said:

"That is quite true. We admit that (italics mine). The stockholders are for the most part retail grocers. Have you any information by which you can say now that the Los Angeles Grocery Company refuses to sell to others than their stockholders?"

The qualification thus added to the admission by the counsel for the commission should, in my opinion, be read in connection with the endeavor shown by the above-quoted testimony of the man at the head of the Grocery Company in question to make it appear that it was a wholesale dealer, by arranging for a nominal 1 per cent. net above the cost of doing business.